Larry BUENDORF, Plaintiff,

v.

NATIONAL PUBLIC RADIO, INC.,
Daniel Schorr and Scott Simon,
Defendants.

Civ. A. No. 92–1829 (JLG).

United States District Court,
District of Columbia.

May 19, 1993.

Michael T. O'Bryant, Silver Spring, MD, James Martin Davis, Omaha, NE, for plaintiff.

Donald J. Mulvihill, Theodore A. Miles, Rynthia M. Rost, Washington, DC, for defendants.

Floyd Abrams, New York City, pro hac vice.

## MEMORANDUM

JUNE L. GREEN, District Judge.

### I. Introduction

This matter is before the Court on defendants' Motion for Summary Judgment. On August 6, 1993, plaintiff filed a complaint charging the defendants with libel and false light invasion of privacy. Plaintiff claims that statements made by defendant Daniel Schorr during the April 11, 1992 broadcast of "Weekend Edition" on National Public Radio were false and defamatory; he asserts that Schorr's statements exposed the plaintiff as a homosexual and constitute libel per se. In their Summary Judgment Motion the defendants claim that Mr. Buendorf is a "public official" and therefore he must show, by clear and convincing evidence, that the defendants acted with "actual malice" in airing the statements which falsely characterized Mr. Buendorf as a homosexual. The Court must determine whether the plaintiff's complaint of libel and invasion of privacy will survive defendants' summary judgment attack based upon the theory that plaintiff is a "public

official." *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

### II. Facts

#### a. *The Parties*

Plaintiff Larry Buendorf is the Special-Agent-in-Charge of the Secret Service detail which protects Gerald Ford, the former President of the United States. Complaint, at 1. He currently holds a Top Secret Security Clearance, and he is held out by the United States of America to be a person in which it puts its trust and confidence. *Id.;* *See* Plaintiff's Answer to Interrogatory, at No. 22, p. 10–11. He is married, has one daughter and is a heterosexual. *See* Complaint, at 4. Mr. Buendorf's reputation is important to him; he feels it is critical for him to have a reputation for being heterosexual, moral, law-abiding, sexually normal, disease-free, blackmail-proof, free from public ridicule and worthy of respect. *See* Plaintiff's Answer to Interrogatory, at No. 28, p. 13.

Defendant National Public Radio, Inc. (NPR) is a not-for-profit corporation, organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C. *See* Complaint, at 1. "Weekend Edition" is a news magazine program that lasts two hours and is broadcast by NPR. *See,* Deposition of Daniel Schorr at 82. Daniel Schorr is a Senior News Analyst for NPR and he was acting in that capacity during NPR's "Weekend Edition" program on April 11, 1992. *See* Answer, at 2. He is a resident of the District of Columbia. *Id.* Scott Simon is a Senior Host for NPR and he was acting in that capacity during NPR's "Weekend Edition" program on April 11, 1992. *Id.* Mr. Simon is a resident of the District of Columbia. *Id.*

#### b. *The Erroneous Statement*

On Friday, April 10, 1992, Daniel Schorr and "Weekend Edition" editor Steve Tripoli met to discuss the content of the "Weekend Edition" Saturday program, for April 11, 1992. *See,* Schorr Deposition at 84, 91. During that meeting, Schorr told Tripoli that

"over a long period of time [he had] become increasingly concerned with the way in which the media trample on the privacy of people." *Id.* at 93. He said this in response to evaluating two news stories of the week that invaded the privacy of two public figures: tennis star Arthur Ashe was disclosed as having the AIDS virus by USA Today, and other news agencies revealed that while presidential candidate Jerry Brown was Governor of California, his home was used for "pot parties" in his absence. *Id.* Schorr told Tripoli that "those two things come together for me in something that I would like to talk about." *Id.*

The news stories regarding Arthur Ashe and Jerry Brown reminded Mr. Schorr of a similar story involving an assassination attempt on President Ford in 1975. *See,* Schorr Deposition at 105–106. He remembered that somebody deflected the assassin's gun and later, was identified in the press as a homosexual. *Id.* It bothered Mr. Schorr that an individual "becomes identified in the press as a homosexual just because he is a hero. The privacy he had before should not be lost when you do [sic] good things." *Id.*

Mr. Schorr instructed his research assistant to "get me the name of that guy who saved President Ford's life." *See,* Schorr Deposition at 114. When Mr. Schorr asked his research assistant to find the information, he did not recall that there were two assassination attempts on President Ford during September 1975. *Id.* Later that day, the research assistant returned with a copy of a September 13, 1975 issue of *Facts on File.* *Id.* at 115–118.

The copy of the September 13, 1975 issue of *Facts on File* recounted the first assassination attempt on President Ford, and it named plaintiff, Larry Buendorf as the Secret Service agent who deflected the gun and detained Lynnette "Squeaky" Fromme. *See,* Defendants' Motion for Summary Judgment, Exhibit I; Schorr Deposition, at 117–118; Schorr Deposition, Exhibit 1. It reads in pertinent part: "The agent whose instant reaction possibly saved the President's life, Larry Buendorf, 37, said Ford was about two feet from Fromme when the agent sighted the gun." *See,* Defendants' Motion for Summary Judgment; Exhibit I; *Facts on File,* September 13, 1975, p. 661. Mr. Schorr mistakenly believed that Larry Buendorf was the individual who foiled the assassination attempt of President Ford, and later was exposed as a homosexual. *See generally,* Schorr Deposition at 115–119, 169, 171.

But Mr. Schorr did not remember that there were two assassination attempts on President Ford during September 1975. *See id.* at 139. The first assassination attempt happened on September 5, 1975, in Sacramento, California. *See,* Defendants' Motion for Summary Judgment; Exhibit I; *Facts on File,* September 13, 1975, p. 661. On that occasion, Secret Service Agent Larry Buendorf grabbed the gun from Lynnette "Squeaky" Fromme and detained her. *Id.* The second assassination attempt occurred on September 22, 1975, in San Francisco, California, when a woman named Sara Jane Moore tried to assassinate President Ford. *See* Complaint, at 3; no. 12. That assassination attempt was foiled when a bystander named Oliver Sipple pushed the assailant's arm and deflected the path of the bullet away from President Ford. *See Id.* In the aftermath of the incident, several newspapers exposed Oliver Sipple as a homosexual. *See, e.g., Sipple v. Chronicle Publishing Co.,* 154 Cal.App.3d 1040, 201 Cal.Rptr. 665 (1st Dist 1984); *Sipple v. Des Moines Register & Tribune Co.,* 82 Cal.App.3d 143, 147 Cal. Rptr. 59 (1st Dist1978).

Mr. Schorr mistakenly thought Larry Buendorf, not Oliver Sipple, was exposed as being a homosexual by print media in 1975. *See,* Schorr Deposition, at 127. He intended to draw a parallel between the current news events regarding Arthur Ashe and Jerry Brown and the situation where an individual was exposed as a homosexual after having saved the President's life. *Id.* By using Arthur Ashe, Jerry Brown and Larry Buendorf as examples of where the press overstepped its bounds, Mr. Schorr planned to discuss questions of "journalistic ethics" on the next day's broadcast of "Weekend Edition Saturday." *See,* Schorr Deposition, Exhibit 3.

On Saturday, April 11, 1992, "NPR produced and transmitted for broadcast by pub-

lic radio stations nation wide a program entitled 'Weekend Edition' and both Daniel Schorr and Scott Simon appeared on that program." Answer, at 4, No. 14. During the program, the following exchange took place:

Daniel SCHORR:

Well, this is an interesting episode. You know it's one of two episodes this week that raised very—quite painful questions about journalistic ethics. You know, there's a great deal of soul-searching going on in the press about the propriety of disclosing that Arthur Ashe has AIDS. The facts are not in doubt, but still there is an invasion of privacy of somebody who says he is a private person with a private family.

You know it reminds me a little bit of a kind of Catch-22—you will not remember the name of Larry Buendorf—in 1975, became a public figure because he saved the life of President Ford. He deflected the gun of Squeaky Fromme ...

Scott SIMON:

Right.

SCHORR:

... who was trying to shoot him ...

SIMON:

Mm-hmm.

SCHORR:

... and then he was exposed as being a homosexual.

SIMON:

Right.

SCHORR:

And they said, 'Why'd you do that?' 'Well, he's a public figure.' How did he get to be a public figure? Because he saved the president's life. And there is a kind of a Catch-22 that goes in there.

Now of course, Brown is a public figure. The question is, 'Must a public figure be fair game for any kind of ambush?' I mean, the worst that's being alleged against him is that there may have been

parties in his house, maybe while he wasn't even there ...

SIMON:

Yeah.

SCHORR:

... maybe that he didn't even know about.

See Defendants' Answer, Exhibit A; "Transcript of 'WEEKEND EDITION' Saturday," April 11, 1992, Noon EDT, at p. 28–29.

### c. The Retraction

Mr. Schorr was not aware of the error he made, naming Larry Buendorf, instead of Oliver Sipple, until this lawsuit was filed on August 6, 1992. See Schorr Deposition at 155–156. Mr. Schorr was not concerned about mentioning the name because the information "was widely known in the first place, and since, as I recall, the guy died, the issue of his privacy no longer pertains." See, Schorr Deposition at 128.[1] On August 6, 1992, NPR issued a press release which apologized to Mr. Buendorf and corrected the error made by Mr. Schorr on the April 11, 1992 broadcast of "Weekend Edition." See Defendants' Motion for Summary Judgment at Exhibit G, "Defendants' Answer to Interrogatories," Attachment E. On August 8, 1992, Daniel Schorr acknowledged his mistake and apologized to Mr. Buendorf on the air, during a broadcast of "Weekend Edition." See id., Attachment D.

These are the events that leads the Court to the task of ruling on the Defendants' Motion for Summary Judgment. At the onset, the Court finds that the statements made by Daniel Schorr on NPR's broadcast of "Weekend Edition Saturday," on April 22, 1992, regarding Mr. Buendorf's sexual preference were false.

### III. Discussion

#### a. Legal Standard

In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court evaluated Mr. Sullivan's claim that an advertisement in the New York

---

1. On February 1, 1989, Oliver Sipple was found dead in his apartment. He died of natural causes. See Deaths Elsewhere, Obituary, Wash. Post, February 5, 1989, at B7.

*Times,* which contained false statements about police action in Alabama, was libelous as to him because he was a City Commissioner of Montgomery, Alabama. The Court asserted that an advertisement is afforded protection by the First Amendment, but the precise question was "whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent." 376 U.S. at 271, 84 S.Ct. at 721.

The Supreme Court determined that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" *Id.* at 279, 84 S.Ct. at 726. "With actual malice" means "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 725–26.

The standard for summary judgment motions which deal with questions of libel and slander of a public official, and proof of actual malice was set forth in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There, the Supreme Court held, "where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." 477 U.S. at 255–256, 106 S.Ct. at 2513–2514. Therefore, the question presented for this Court is whether a reasonable jury could find that the facts alleged by the plaintiff constitute, by clear and convincing evidence, that the false statements made by Mr. Schorr on NPR's broadcast of "Weekend Edition Saturday" were made with actual malice.[2]

b. *Public Official*

 In order to resolve this question, the Court must first determine whether Mr. Buendorf is a public official. Since the *New York Times* case, the Supreme Court has provided the lower courts with guidance to identify individuals who are public officials. *See Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In *Rosenblatt,* the Court said, "the 'public official' designation applies **at the very least** to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." 383 U.S. at 85, 86 S.Ct. at 675. [emphasis added]. In the application of this "substantial responsibility" test, the law is clear that individuals involved in law enforcement are public officials and that the standard enunciated in *New York Times Co. v. Sullivan* applies to them. *See, e.g., St. Amant v. Thompson, supra* (deputy sheriff of East Baton Rouge); *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (deputy chief of detectives of the Chicago Police Department); *White v. Fraternal Order of Police,* 909 F.2d 512, 517 (D.C.Cir.1990) (captain in Washington, D.C. Metropolitan Police Department); *Meiners v. Moriarity,* 563 F.2d 343, (7th Cir.1977) (federal agents); *see also,* Bruce W. Sanford, *Libel and Privacy* § 7.2.3.2 (2d. ed. 1991) [citing cases]; Rodney A. Smolla, *Law of Defamation* § 2.26[1] (Release # 6, 1/93) [citing cases].

In *Meiners v. Moriarity,* federal agents asserted a defamation counterclaim against an individual who claimed his constitutional rights were violated when he was arrested during a drug raid. In upholding the trial court's determination that the federal agents were "public officials" and had to prove "actual malice," the Seventh Circuit said, "[t]he public is certainly interested in an important and special way in the qualifications and performance of federal agents ... whose decisions to search and arrest directly and personally affect individual freedoms." 563 F.2d at 352. Like the federal agents in *Meiners,* Mr. Buendorf, is a federal law enforcement officer. He is the Special–Agent–In–Charge

---

**2.** Although Scott Simon is named as a defendant in this case, the plaintiff has not offered any evidence to suggest that he was involved in the formulation and subsequent airing of the defamatory statements. Therefore, the Court dismisses the Complaint as to Mr. Simon.

of former President Ford's Protective Division. *See* Plaintiff's Answer to Interrogatory No. 1 at 1.

Some of Mr. Buendorf's duties include: supervision and training of the staff assigned to protect former President Ford, administration of reports and forms disseminated by the Ford Protective Operation and interviews of persons who may pose a threat to former President Ford. He is authorized to use "whatever force is necessary, including making arrests to quell a disturbance and screen the former President ... from attack." *See,* Defendants' Motion for Summary Judgment, Exh. B. Furthermore, the Special–Agent–in–Charge is expected to "possess the ability to remain calm in the face of crisis and use a high degree of judgment in meeting emergency situations." *See id.* In his supervisory role, Buendorf is required to make emergency decisions requiring immediate action and responsibility for the decisions is accepted by him. *See,* Defendants' Motion for Summary Judgment, Exh. B.

The facts show that Buendorf is the supervisor detailed to insure former President Ford's safety. His job description demonstrates that Mr. Buendorf must be prepared to make judgment calls and split-second decisions, and he is authorized to use whatever force is necessary to protect former President Ford. As in *Meiners*, Mr. Buendorf's qualifications and performance are of interest to the public in an important and special way—because his assigned duties could affect an individual's personal freedom. Furthermore, Mr. Buendorf's role as Special–Agent–In–Charge of the former President's Protective Division proves that he has "substantial responsibility for and [some] control over the conduct of government affairs," in connection with the protection and safety of former President Ford. *See Rosenblatt*, 383 U.S. at 85, 86 S.Ct. at 675. Therefore, the Court finds that the plaintiff is a public official for the purposes of this analysis.[3]

c. *Relatedness*

█ As a public official, Mr. Buendorf is prohibited "from recovering damages for a

defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" *New York Times Co. v. Sullivan, supra* 376 U.S. at 279–280, 84 S.Ct. at 725–26. Plaintiff argues that the statement made by Daniel Schorr on NPR's "Weekend Edition" news program, regarding Mr. Buendorf's sexual preference, was not related sufficiently to his official conduct to trigger the application of the *New York Times* rule. He urges the Court to find that *New York Times* does not apply because there is no nexus between Mr. Buendorf's official conduct and the defamatory statement.

The Supreme Court has addressed the issue of what statements are outside the scope of the *New York Times* rule. In *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), a district attorney criticized eight state court judges during a press conference. He attributed the "large backlog of pending criminal cases to the inefficiency, laziness, and excessive vacations of the judges ..." *Id.* at 66, 85 S.Ct. at 211. In reversing the state court's conviction for criminal libel, the Supreme Court made clear that most comments about public officials are protected under the rule. "The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant." *Id.* at 77, 85 S.Ct. at 217. Several years later, in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), the Court held "as a matter of constitutional law, that a charge of criminal conduct, ... can never be irrelevant to an official's or a candidate's fitness for office for purposes of application of the ... rule of *New York Times Co. v. Sullivan.*" *Id.* 376 U.S. at 277, 84 S.Ct. at 724.

Although the subject matter of the false statement made by Daniel Schorr in this case involved a personal, albeit, private matter, "the *New York Times* rule is not rendered

---

**3.** Because Mr. Buendorf is a "public official" the Court will not reach the question of whether or not he is a "public figure." *See, Curtis Pub. Co.*

*v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending the rule of *New York Times* to include "public figures").

inapplicable merely because an official's private reputation, as well as his public reputation is harmed." *Garrison, supra,* 379 U.S. at 77, 85 S.Ct. at 217. The Court asserted that "anything which might touch on an official's fitness for office is relevant." *Id.* In his answers to interrogatories, Mr. Buendorf explained that a "[a]nyone in government with a secret clearance who is practicing homosexual sex is subject to being blackmailed or compromised for fear of disclosure." Defendants' Motion for Summary Judgment, Exh. A, No. 27, at 12. Essentially, Mr. Buendorf believes that his professional reputation has been damaged by the false statements because he will no longer be regarded as "heterosexual, moral, law-abiding, sexually normal, disease-free, blackmail proof, free from public ridicule and worthy of respect." *Id.*

Mr. Buendorf's frank reflections show that statements falsely labelling a Secret Service agent as a homosexual "might touch on" his ability to perform official duties. *Garrison, supra* at 77, 85 S.Ct. at 217. Essentially, Mr. Buendorf shows that if Mr. Schorr's statements were true, they could affect an individual's ability to perform public duties as the Special–Agent–in–Charge of the Secret Service detail assigned to protect the former president of the United States. As in *Garrison,* where the district attorney's statements attacked the honesty and personal integrity of some judges, Mr. Schorr's statements attacked Mr. Buendorf's reputation as a heterosexual, law-abiding individual, who is insulated from blackmail and negative innuendo. Although the Court does not doubt that the false statements had a personal impact on Mr. Buendorf, his argument is not persuasive. The Supreme Court and lower courts have construed the rule of *New York Times Co. v. Sullivan* to include almost any comment regarding a public official. *See generally,* Bruce W. Sanford, *Libel and Privacy* § 7.2.4 at 285 (2d. ed. 1991); Rodney A. Smolla, *Law of Defamation* § 2.27[1] at 2–94 (Release # 6, 1/93). As in *Garrison,* the Court does not think "that [the] statement may be considered as one constituting only a purely private defamation." *Id.* at 76, 85 S.Ct. at 217. The Court finds that the statement is sufficiently related to Mr. Buendorf's

official conduct, and therefore the rule of *New York Times Co. v. Sullivan* applies.

### d. *Actual Malice*

■ The First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan, supra* 376 U.S. at 279–280, 84 S.Ct. at 725–726. Therefore, in order for plaintiff to succeed, he must show that Mr. Schorr knew that his statement was false, or that Mr. Schorr had reckless disregard for whether the statement was true or not. The facts on the record support the Court's finding that Mr. Schorr made the statement without knowledge that it was false. *See supra* at 8–9.

■ The Court turns to the question of whether Mr. Schorr's "statement was made with reckless disregard of whether it was false or not." *New York Times, supra* at 280, 84 S.Ct. at 726. In order to prove that a statement was made with reckless disregard for the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant, supra* 390 U.S. at 731, 88 S.Ct. at 1325. The Supreme Court has held that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989).

There is no evidence in the record to suggest that the defendants "entertained serious doubts" as to whether or not Mr. Buendorf was a homosexual. The evidence shows that the defendants could have been more diligent in their research. But this error does not rise to the level of "reckless disregard" as declared by *Harte–Hanks.*

■ At oral argument, plaintiff's counsel conceded that there was no "actual malice" in this case, but then went on to argue that the

defendants demonstrated "reckless disregard" because they "sent a little girl up there to get *Facts on File.*" Plaintiff failed to acknowledge that "reckless disregard" is part and parcel of "actual malice." As plaintiff admits there was no "actual malice," there cannot be "reckless disregard." *See New York Times, supra* at 279–280, 84 S.Ct. at 725–726 ("actual malice—that is, with knowledge that it was false or with **reckless disregard of whether it was false or not.**") (emphasis added). In spite of plaintiff's misinterpretation of *New York Times Co. v. Sullivan,* the rule is clear: failure to investigate thoroughly before publication, does not rise to the level of reckless disregard. *See Harte–Hanks, supra* at 688, 109 S.Ct. at 2696. Based upon the alleged facts and the "actual malice" standard defined in *New York Times* and its progeny, the Court finds that there is no evidence of "reckless disregard for the truth" in this case. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). Accordingly, the Court concludes that the record does not contain clear and convincing evidence to support a jury finding of "actual malice." *See Liberty Lobby, supra* 477 U.S. at 255–256, 106 S.Ct. at 2513–2514.

IV. Conclusion

The record shows that the defendants, Mr. Schorr and NPR made a mistake. They misnamed the plaintiff as the individual who was exposed as being a homosexual after an attempted assassination of President Ford in 1975. Because the plaintiff is a public official, he was held to the difficult task of proving "actual malice" by the defendants. [This standard] "exacts a . . . high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. *Gertz, supra* 418 U.S. at 342, 94 S.Ct. at 3008.

The defendants clearly are entitled to the protections offered by *New York Times Co. v. Sullivan, supra.* The plaintiff does not show that Mr. Schorr and NPR made the false statement with "actual malice," therefore, plaintiff is not entitled to recover dam-

ages for the alleged defamatory falsehood. This Court wholeheartedly echoes the Supreme Court's conclusion that "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz, supra* at 341, 94 S.Ct. at 3008.

For the reasons set forth above, pursuant to Federal Rule of Civil Procedure 56, the Court finds that there is no genuine issue as to any material fact in this case. The defendants' Motion for Summary Judgement is granted and the Complaint is dismissed with prejudice.